```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2

 3   ----------------------------------X
                                       :
 4   ROBERT HOGAN a/k/a CHRISTOPHER    :
     PAYTON MAY-SHAW,                   :
 5                                      :
                       Plaintiff,      :   17-CV-5591 (KAM)
 6                                      :
                  v.                    :   225 Cadman Plaza East
 7                                      :   Brooklyn, New York
     CITY OF NEW YORK, et al.,          :
 8                                      :   May 10, 2018
                       Defendants.      :
 9   ----------------------------------X

10
        TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE STATUS CONFERENCE
11                  BEFORE THE HONORABLE LOIS BLOOM
                    UNITED STATES MAGISTRATE JUDGE
12

13   APPEARANCES:

14   For the Plaintiff:        ROBERT HOGAN, Pro Se
                               a/k/a Christopher Payton May-Shaw
15                             #11506-040
                               Newaygo County Jail
16                             1035 E. James Street
                               P.O. Box 845
17                             White Cloud, Michigan 49349

18
     For the Defendant:        SAMANTHA MILLAR, ESQ.
19                             RACHEL SELIGMAN, ESQ.
                               Office of the Corporation Counsel
20                             New York City Law Department
                               100 Church Street
21                             New York, New York 10007

22
     Court Transcriber:        SHARI RIEMER, CET-805
23                             TypeWrite Word Processing Service
                               211 N Milton Road
24                             Saratoga Springs, New York 12866

25


     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service
```

2

1    (Proceedings began 9:04 a.m.)

2              THE CLERK:  Civil Cause for Telephone Conference,

3    Docket No. 17-CV-5591, Hogan v. City of New York.

4              Will the parties please state your names for the

5    record?

6              MR. MAY-SHAW:  Christopher May-Shaw, plaintiff.

7              MS. MILLAR:  Good morning, Your Honor.  Samantha

8    Millar from the New York City Law Department for defendant.

9              MS. SELIGMAN:  And also Rachel Seligman for the

10   defendants.

11             THE CLERK:  The Honorable Lois Bloom presiding.

12             THE COURT:  Good morning, Mr. May-Shaw, good

13   morning, Ms. Millar and good morning, Ms. Seligman.  How is

14   everybody today?

15             MS. MILLAR:  Thank you, Your Honor.

16             MS. SELIGMAN:  Well, thank you.

17             THE COURT:  So, Mr. May-Shaw, I did receive your

18   letter.  Very nice handwriting, Mr. May-Shaw.

19             MR. MAY-SHAW:  [Inaudible]

20             THE COURT:  And it states that this letter was also

21   sent to you, Ms. Millar, which encloses a number of, I hope,

22   other documents that show what attempts were made by Mr. May-

23   Shaw's mother to try to get the property back.

24             Has there been any progress, Ms. Millar?  What have

25   you been able to find out?

1          MS. MILLAR:  Yes, Your Honor.  So I did receive Mr.

2    May-Shaw's [inaudible] I haven't received the last document

3    myself yet but I assume [inaudible] comes in the mail.

4          Regarding the property, so specifically regarding

5    the money after [inaudible] release from the City.  The NYPD

6    received by letter requests from the U.S. Marshals asking

7    [inaudible] the money.

8          THE COURT:  Excuse me.  Wait, wait, wait.  Mr. May-

9    Shaw, is there noise in the background where you are?  Is that

10   what's going on?

11         MR. MAY-SHAW:  No, it's not from my end.  I'm

12   [inaudible].  No noise coming from my end.

13         THE COURT:  Are you on a speaker phone?  Is that

14   what's going on because there's a lot of noise on our end?

15         MR. MAY-SHAW:  No.  Yes, yes, I was on the speaker

16   phone.

17         THE COURT:  That's so much better.  Okay.

18         MR. MAY-SHAW:  Okay.  I'm sorry about this.

19         THE COURT:  I'm sorry, Ms. Millar.  Can you tell me

20   -- the City's received a letter from the United States

21   Marshals?

22         MS. MILLAR:  Yes.  The NYPD received a letter from

23   the U.S. Marshals stating that the Marshals were in the

24   process of seeking a seizure warrant for the currency that was

25   being held by NYPD as a result of plaintiff's arrest in June

4

1    2016.

2            THE COURT:  What's the date on the letter?

3            MS. MILLAR:  It was August 23, 2017.

4            THE COURT:  And when was he released?

5            MS. MILLAR:  I believe he was released around mid

6    August 2017.

7            THE COURT:  So they said they're in the process of

8    getting a warrant but they didn't have a warrant yet; is that

9    correct?

10           MS. MILLAR:  That's correct.  They requested NYPD to

11   hold onto the currency and a warrant was in fact obtained in

12   October of 2017.

13           THE COURT:  In October.  So NYPD held it for two

14   months to accommodate the U.S. Marshals.

15           MS. MILLAR:  Yes, Your Honor.

16           THE COURT:  Is there a name on the Marshal's letter

17   and is this something that you can submit?

18           MS. MILLAR:  Yes, there is a name on the letter,

19   Your Honor.

20           THE COURT:  Have you gotten a copy of this letter,

21   Mr. May-Shaw?

22           MR. MAY-SHAW:  No, ma'am.

23           MS. MILLAR:  Your Honor, I just received this so it

24   is something that I can send to Mr. May-Shaw.

25           THE COURT:  So I'm not trying to jump ahead too much

5

1    but again getting a letter saying please hold somebody's

2    property, we're trying to get a warrant and then holding it

3    for two months until October strikes me as something that

4    either is a custom policy or practice.  I understand it put

5    the NYPD in a bind but it's a similar issue that's going on

6    with holding detainees for pick up by the immigration

7    officials.  These are liberty interests.  Here it's a property

8    interest.  People are not supposed to be held without due

9    process and property is not supposed to be held without due

10   process.

11           Mr. May-Shaw never got any notice that the Marshals

12   had sent this letter to the NYPD.  The NYPD held onto the

13   money to then turn it over to the Marshals two months later.

14   There was no right during that two-month period for NYPD to

15   hold his money.  Once he's released he should have gotten his

16   money back.

17           MR. MAY-SHAW:  Your Honor, for the record, now I

18   understand how the documents didn't make it but I

19   understand -- I don't understand the mail process.  However, I

20   was looking through the stuff that my mother did send me and

21   there was kind of a lot of confusion.  I don't want to blame

22   anybody but to me it seemed like Mr. Jingu Chong [Ph.], he

23   ordered the property to be released.  Every time he forwarded

24   this --

25           THE COURT:  That's the District Attorney.

1          MR. MAY-SHAW:  Yes, the Assistant District Attorney,

2    yes.  Once he moved to -- one he suppressed the evidence and

3    he moved to dismiss the rest of the case he ordered right then

4    and there, you know, my mother in the courtroom he told her

5    you can go to the property office and start the process.

6    Every time she went to -- this lady name was -- she was a

7    supervisor at the property clerk.

8          THE COURT:  I see Cassandra Allen.  You have her

9    name on the letter.

10          MR. MAY-SHAW:  Yes, yes.  Yes.  She -- I don't

11   understand how she messed up on the vouchers.  He even had

12   every voucher.  You know, we had every right voucher and every

13   time she submitted for my mother to go get the property she

14   wrote the wrong numbers down and my mother also, you know,

15   even stated that she was very unprofessional.  To everybody

16   else was at least trying to help.  But it just seemed like

17   they were giving her the runaround to stall so she couldn't

18   get the property and she was very upset.  We almost wasted

19   about $15,000 for her coming back and forth to New York just

20   to make sure the hearings and stuff.  She was there at every

21   hearing and all this and even afterwards.

22          THE COURT:  Well, the hearings are something

23   separate, Mr. May-Shaw.

24          MR. MAY-SHAW:  Yes, ma'am, yes.  I understand.

25   That's --

7

1          THE COURT:  I'm really inquiring about why your

2     property was held after the charges against you were

3     dismissed.

4          MR. MAY-SHAW:  Yes.

5          THE COURT:  And it's disturbing to me, Ms. Millar,

6     and you can understand why, that it's on an informal letter

7     from another agency of a different institution.  The United

8     States Marshals were telling you they were in the process of

9     trying to get a warrant but if the date on that letter is

10    August 23rd and the warrant doesn't come in until October that

11    still seems to me to be a due process problem.  Even though

12    Mr. May-Shaw may be pro se these are issues and if this is

13    what's going on behind the curtain here the NYPD has got to be

14    held accountable.

15          He had $6,000 when he was arrested.  He's being very

16    clear that the DA said that he could get that money back.

17    He's given the runaround by the NYPD and then voila, the money

18    goes to the feds in October.  He's released in August.

19          MS. SELIGMAN:  Your Honor, I think the landscape

20    would be a bit different if the money actually -- if the

21    Government didn't actually get the warrant.

22          THE COURT:  Ms. Seligman, they didn't get the

23    warrant until October.

24          MS. SELIGMAN:  I understand that.

25          THE COURT:  You're going to say to me that as soon

8

1   as they write you a letter you have the right under the

2   constitution -- as soon as some agency of government says

3   we're going after this guy for this you have the right to hold

4   it without giving him any process?

5           MS. MILLAR:  Well, I don't know that he did not

6   get -- was he notified?

7           MS. SELIGMAN:  Yes --

8           THE COURT:  This is what he is being told.  He's

9   being told by the DA go get his process -- go get his

10  property.  He goes to the property clerk.  We have this in

11  documents.  The Kings County property clerk.  And then the

12  property clerk writes the wrong voucher number so you're going

13  to claim oh, it was just a mistake but I think there's a

14  policy at work behind this, Ms. Seligman, and I think this is

15  something that the NYPD either has to own up to -- again,

16  these property claims are just -- it's astounding to me.  It's

17  astounding that somebody can be given a voucher.  So okay, you

18  got check the box.  You give them a voucher now.  But they

19  can't get their property back after the charges are dismissed.

20          MS. SELIGMAN:  I think that -- I'm also just

21  differentiating between the physical property and the money.

22  I mean I think that the --

23          THE COURT:  Why?  Why?  He didn't get either of

24  them.  Why are you differentiating between them?  He didn't

25  get either.

9

1          MS. SELIGMAN:  Because I don't think he's entitled

2    to the money.

3          THE COURT:  He didn't get his glasses, keys and the

4    $6,737, Ms. Seligman.

5          MS. SELIGMAN:  And I don't think he was entitled to

6    recover the money because of the notification from the federal

7    government they were going to obtain a warrant.

8          THE COURT:  I think that you should litigate that

9    case and I think I should get somebody from the NYCLU to

10   litigate that case with the NYPD.

11         MS. SELIGMAN:  Okay.

12         THE COURT:  I think getting the letter -- I think

13   getting the letter from another agency saying we intend to go

14   after this where the person who owns that property was told in

15   August that they could retrieve that property because they

16   were vindicated of the charges -- one hand of government I

17   understand wants to cooperate with the other hand of

18   government but you don't have a right to deprive people of due

19   process.  Due process requires notice and an opportunity to be

20   heard.  He's told he can get his stuff.  Go to the property

21   clerk.

22         The property clerk is delaying giving him the money

23   because they got a letter from the Marshals saying we're going

24   to get a warrant and then you get the warrant in October.

25   That doesn't sound like a problem to you?

10

1        MS. SELIGMAN:  I think that we were entitled to hold

2   the money and in fact a warrant was finally obtained by the

3   Government.  If we had returned the money to him -- I mean we

4   were in a no win situation here, Your Honor, because --

5        THE COURT:  No, that's not true.  That's not true.

6   As much as the Government has the right to cooperate with

7   other arms of government if you said you have two days to get

8   the warrant or else we're going to have to release the money

9   guess what, they would have either gotten the warrant or not

10  gotten the warrant.  Instead you hold it for a month and a

11  half, at least a month and a half between August and October?

12       MS. SELIGMAN:  I don't know what -- other than the

13  due process issue -- I understand the due process issue but at

14  the end of the day the warrant was obtained and the money was

15  not returned.

16       THE COURT:  So now you're going to say if you get

17  the warrant after the fact then everything in that policy is

18  okay?  There is no qualified immunity for Monell claims and

19  you know that, Ms. Seligman.

20       MS. SELIGMAN:  Of course I do and I'm not suggesting

21  that it's an immunity argument but I'm saying that I think

22  that they're refusing to play here.  One is the request from

23  the Government that we received to hold the money.

24       THE COURT:  Which Mr. May-Shaw never got a copy of

25  and still doesn't have.  So I would like that to be sent --

11

1  Ms. Seligman, I would like that to be sent to the Court and to

2  Mr. May-Shaw right away.

3        MS. SELIGMAN:  Sure.  I would be happy to.  But I'm

4  not so sure he didn't receive notice from the Government.

5        THE COURT:  You don't know much about the case, Ms.

6  Seligman.  Look, I understand you're the supervisor.  Ms.

7  Millar is very able to represent the City on this.  She has

8  been diligent.  I have been --

9        MS. SELIGMAN:  [Inaudible], Your Honor.  I

10  appreciate that.

11        THE COURT:  I have been pushing her because again

12  these are things that come up over and over and over again how

13  the City is sort of taking a shortcut to get to what may be

14  the right end.  Yes, they may have been entitled, the federal

15  government to seize his money.

16        MS. SELIGMAN:  But, Your Honor, truth -- the

17  information that we have is that two days after NYPD received

18  the letter from the federal government they informed plaintiff

19  by care of his mother that they received a demand to hold the

20  money.

21        THE COURT:  What does a demand --

22        MS. SELIGMAN:  So he was in fact --

23        THE COURT:  What does a demand -- let's assume, Ms.

24  Seligman, that the demand came in but you didn't get a warrant

25  in October.  How long was the City going to hold that money

12

 1    pursuant to the demand and what law gives the City the right

 2    to hold that based on a demand?

 3                MS. SELIGMAN:  I don't know what law and we're happy

 4    to do some additional research and to provide that to the

 5    Court but I do know that he was provided with his due process

 6    because we did notify him.

 7                THE COURT:  That's not due process.  Giving notice

 8    without an opportunity to be heard is not due process.  So

 9    just forwarding a Marshal's letter saying we intend to go

10    after your money -- look, the IRS, the Marshals, they could

11    all come after anybody's money.  They're very well equipped to

12    do that.  That you're assisting them by holding somebody's

13    money for two months because the DA said you can go get your

14    money, you're cleared, that's the issue here.  That the

15    Marshals want to get somebody's money they're very well

16    equipped to do that and they know they have to get a warrant

17    and sending a letter saying we intend to get a warrant doesn't

18    freeze a bank account.  It doesn't hold somebody's money.  Due

19    process is not something that the City gets to determine.

20                Yes, Mr. May-Shaw.

21                MR. MAY-SHAW:  Yes.  We never received nothing,

22    nothing at all.  If that was the case my mother would have

23    just stopped attempting to send demands.  The demand letter

24    she did send to New York.  I have the document here in my

25    hand.  August 1st they told her to go get the -- they released

13

1   the voucher number, the voucher number with the money and

2   everything.  She went and was still turned around and that was

3   stamped by the District Attorney's Office, Kings County,

4   property release 2017 August 1st.  She was in New York to

5   receive that.

6            Subsequently she filed -- they told her to file --

7   go somewhere else and file another demand which she filed and

8   I believe was -- I got the document here.  Let me find it.  If

9   I have to I will send everything to the Court as well because

10  we have no -- we didn't know what they were doing and the

11  whole thing about it was when I asked the investigation

12  department to investigate the situation about like my receipt

13  books to show that the money was not obtained illegally.  I

14  had every receipt to show.  There were three receipt books.

15  The only vouchered one.  One was full of car deliveries where

16  every -- all the information on there and it's like they held

17  that.  So basically the Grand Rapids police department or

18  whoever was investigating would believe that the money was

19  from drugs.  And if I knew it was illegal I wouldn't even be,

20  you know, trying to litigate this period.

21           Let me find this demand letter and I can give you

22  the date, the exact date that she went to --

23                      [Pause in proceedings.]

24           MR. MAY-SHAW:  Let me see here.

25                      [Pause in proceedings.]

14

1          THE COURT:  Again, Ms. Seligman, while Mr. May-Shaw

2    is looking and Ms. Millar, I don't think that Mr. May-Shaw is

3    making a claim against the $93,000 or the firearm or the other

4    things that were found when they did the inventory search of

5    the vehicle.  But he is saying that when the charges were

6    dismissed on August 1st he was given a property release from

7    the District Attorney's office.  The NYPD received the letter

8    from the Marshal Service August 23rd.  So that's a three week

9    gap that nobody is giving him his property back.  Then you're

10   holding it for them to get a seizure warrant in October.  This

11   is a problem.

12          Either the City is going to want to come to the

13   table and settle the case with Mr. May-Shaw or I'm going to

14   have to look for pro bono counsel to litigate this issue about

15   how the City deals with property.

16          MS. SELIGMAN:  Your Honor, we are not willing -- Mr.

17   Mayfield [sic] forfeited that money as part of his guilty

18   plea.

19          THE COURT:  Mr. May-Shaw.  And he did --

20          MS. SELIGMAN:  Mr. May-Shaw, my apologies.

21          THE COURT:  He did not forfeit the money that was in

22   his pocket, the $6,736 in cash that was in his pocket as well

23   as his sunglasses, his IDs, his keys.  He did not forfeit all

24   of those.

25          MS. SELIGMAN:  We believe -- the information that we

15

1  have is that the money, his guilty plea --

2          THE COURT:  When was his guilty plea, Ms. Seligman?

3          MS. SELIGMAN:  $9,736 --

4          THE COURT:  Ms. Seligman, when was his guilty plea?

5          MS. SELIGMAN:  We're looking it up.

6          THE COURT:  Mr. May-Shaw, your guilty plea was?

7          MR. MAY-SHAW:  March 6, 2018.

8          THE COURT:  3/6/2018.  So your claim, Ms. Seligman,

9  is that the NYPD has no problem with this because in March of

10 2018 he pled guilty which means that in August of 2017 they

11 have the right to hold his property.  Does that make sense to

12 you?

13         MS. SELIGMAN:  I believe that -- yes, I believe that

14 we had the right to hold his property and I believe that

15 his --

16         THE COURT:  When the charges were dismissed what was

17 the right to hold the property?

18         MS. SELIGMAN:  The notification of the letter from

19 the federal government.

20         THE COURT:  The Government's letter was August 23rd.

21 He got the property released from the DA's office August 1st.

22 What was the authority to hold the property between August 1st

23 and August 23rd?

24         MS. SELIGMAN:  I guess I would need to know more

25 about the efforts that were taken in that two week period.

16

1        THE COURT:  He's saying that his mother went

2   directly over to the property clerk.  He has a name of the

3   property clerk.  She kept going.  So you're going to lay it on

4   him?

5        MS. SELIGMAN:  Well, I'm going to say that from what

6   we understand also that on August 8th he was -- that the NYPD

7   civil enforcement unit contacted his mother stating that there

8   was a problem with the power of attorney that she had

9   provided.  In fact, the power of attorney had a missing

10  signature page.  So let's -- even assuming she went, she

11  didn't have the proper power of attorney to obtain the money.

12       THE COURT:  So that took them a week to tell her

13  because she's saying she went August 1st.  So a week later

14  they say she doesn't have the right forms.

15       MS. SELIGMAN:  Yes, that's right.

16       THE COURT:  Okay.

17       MR. MAY-SHAW:  Your Honor, that was July 19th when

18  Mr. Jingu Chong spoke with my mother at the court.  Ms. Donna

19  Simpson [Ph.] was very -- she let me speak to my mother right

20  then and there.  I said hey, talk to them about the property

21  and that wasn't just the 6,700.  That was about all of it.

22  The money, the $93,000 and all -- you know, all of it.  And

23  they were, you know, she said hey, you won, you'll get -- go

24  get the property and they wasn't giving it.  But a copy of

25  that demand was sent to Ms. Millar.  I don't have it -- I do

17

1  have it but I don't have it in this [inaudible].

2          THE COURT:  I understand.  That's fine, Mr. May-

3  Shaw.

4          Look, this is troubling to me because again the City

5  has certain issues with its practices, its NYPD practices.  If

6  the DA tells somebody their money should be released they

7  shouldn't be jumping up and through hoops and not getting

8  notice and three weeks later there's a letter from the feds

9  and then the feds get the City to hold it without there being

10 any other process given to Mr. Hogan for three months from

11 August 1st until whenever it was in October that there was a

12 warrant.  What was the exact date, Ms. Millar?

13         MS. MILLAR:  It was October 27, 2017.

14         THE COURT:  Okay.  So that's what this issue is.  If

15 the City doesn't want to try to make this right with Mr. May-

16 Shaw -- I'm not talking about the 93,000.  He has -- again,

17 there are problems, Ms. Seligman, because quite frankly if he

18 was entitled to his money back and if that's what the DA's

19 property release said and he couldn't get his money back

20 because the City has a policy, custom or practice where either

21 it's going to cooperate informally with other law enforcement,

22 it's going to put up barriers by having property clerks not

23 retrieve the property.  I don't exactly know what went wrong

24 here but that is an issue.

25         He was vindicated of the charges here.  Yes, you're

18

1   right that in March 6th of 2018 he pled guilty in a federal

2   case and as part of that he signed something for forfeiture

3   but if he had been given his money back in August when he

4   first demanded it -- and I'm not talking about the 93.  I'm

5   specifically talking about the $6,000 that was taken from his

6   person at the 67th Precinct, his glasses, his keys, he may

7   have had an opportunity to do something with that money, to

8   prove that that money was not part of the drug whatever

9   conviction he had in March of 2018, and the NYPD essentially

10  deprived him of that opportunity.

11          The burden in the constitution does not put the

12  burden on plaintiff in this sort of situation.  If he was

13  given a property release by a district attorney that the

14  charges were dismissed I don't believe that the City of New

15  York had any authority from that August 1st date when the

16  property release was signed to hold onto it until October 27th

17  for the warrant.  I think that's where the City is getting

18  itself into hot water and overstepping.

19          So, Mr. May-Shaw, the difficulty here is there is no

20  right to counsel in a civil case and all I can do is request

21  counsel to volunteer to take your case and they would

22  specifically be on this issue of whether or not you were

23  denied your property without being given due process.

24          I'm not talking about the result, Ms. Seligman.

25  That he was convicted on a plea in March 6th of 2018 does not

19

1  let the City off the hook for a custom, policy or practice

2  that unconstitutionally denies people their right to their

3  property without due process of law.

4       MS. SELIGMAN:  No, but I think, Your Honor,

5  respectfully that the outcome informs the earlier -- is

6  informative because I think that not surprisingly because it

7  was perhaps thought that he was going to have to forfeit the

8  money he attempted to get it --

9       THE COURT:  Ms. Seligman, please.

10      MS. SELIGMAN:  No, I --

11      THE COURT:  You need a warrant --

12      MS. SELIGMAN:  I understand that.

13      THE COURT:  You need a warrant to take somebody's

14 property.  You didn't have a warrant until October 27th.  You

15 held onto his property from August 1st until October 27th

16 without a warrant.  That's a problem.

17      MS. SELIGMAN:  I'm also not sure that his guilty

18 plea under Heck v. Humphrey doesn't bar his constitutional

19 claim now to due process.

20      THE COURT:  Oh, absolutely not.  This has nothing to

21 do with whether or not his conviction could be overturned.

22 The property, and there is in Heck itself -- I believe it's

23 Footnote 4 but I'm not a hundred percent correct, that if

24 there's something that goes wrong during an arrest that

25 somebody's rights are violated, that's not going to insulate.

20

1   It does under -- if it undermines the validity of the

2   conviction then there's a Heck issue.

3            Ms. Seligman, don't throw up these little, you know,

4   flags to me.

5            MS. SELIGMAN:  So that was --

6            THE COURT:  This gets me only more, you know, sure

7   that I need to get counsel because if you can't see -- this

8   doesn't undermine the validity of his guilty plea.  To say

9   that the police held onto his money without due process of law

10  does nothing to say I'm not guilty.  It doesn't undermine --

11  there is no false arrest claim here.  He's not bringing --

12           MS. SELIGMAN:  No, but he's forfeited the money and

13  that was part of it and it goes directly to the heart of what

14  he's claiming now.

15           THE COURT:  Sorry.  I am not buying it.  I'm really

16  distressed that as a supervisor at the City you're not seeing

17  that there might be a problem that the City held somebody's

18  property from August 1st until October 27th without a warrant.

19  So I can write a letter to somebody and say you know, I'm

20  thinking of getting a warrant, please hold the property?

21  That's how the Government now works on a wink and a handshake?

22  Forget about the constitution?  I'm sorry.  That really, you

23  know, is distressing to me.

24           MS. SELIGMAN:  Well, Your Honor, we started this

25  conversation before the Court got on the line and we were

21

1  talking to the plaintiff about the property that we were

2  considering compensating him for and those were the sunglasses

3  and the sunglasses are extremely pricey.  We had never heard

4  of frankly such expensive sunglasses and we asked him to

5  provide documentation about the glasses.  We think they were

6  $2,400.

7          THE COURT:  Well, he'll add that on to the bill here

8  because I'm sure you didn't get a warrant for the sunglasses.

9          MS. SELIGMAN:  No.  The property was properly

10  vouchered.

11          THE COURT:  How come he didn't get it back if it was

12  properly vouchered?

13          MS. SELIGMAN:  From what I understand [inaudible]

14  returned --

15          THE COURT:  What is the point of having a voucher if

16  somebody can't get their property back after charges are

17  dismissed?

18          MS. SELIGMAN:  I understand which is why the --

19  because here about 50 or so pieces of property were vouchered,

20  the vouchering officer decided that it was going to be --

21  perhaps at the time he couldn't discern whose property was who

22  but at the time they vouchered all the property on one

23  document to two owners.  So I don't think that that

24  necessarily is the proper way to have done it but it may have

25  been done that way because there was so much property or

22

1   because they couldn't discern who the owner was.

2           THE COURT:  Can I just ask you.  Is this something

3   that happens frequently in the City of New York?  I bet it

4   does.

5           MS. SELIGMAN:  I don't think it is.  I don't think

6   it is, Your Honor.  I've handled enough cases and I guess --

7           THE COURT:  So you're going to stand behind the

8   property clerks do everything right?

9           MS. SELIGMAN:  No, not at all.  I'm not saying the

10  property clerks do everything right but I'm saying here that

11  the voucher was vouchered for two individuals on the same

12  document and that he did not get his sunglasses and the

13  sunglasses were extremely pricey and we are willing to look

14  into compensating him for those sunglasses.

15          THE COURT:  Well, if I was Mr. May-Shaw I would just

16  see if I could try to find pro bono counsel for him.

17          MS. SELIGMAN:  Okay.

18          MR. MAY-SHAW:  Now, Mr. May-Shaw, as I said, you're

19  in White Cloud, Michigan.  It may not be the easiest case for

20  me to find somebody to be interested in but if there is

21  somebody they will be volunteering.  They will not get paid.

22  They will be doing this out of the goodness of their heart.

23  So if there is somebody that contacts you who's interested in

24  trying to pursue this claim I urge you to try to cooperate

25  with them.  Will you?

23

1          MR. MAY-SHAW:  Yes, ma'am.  Not a problem.

2          THE COURT:  And as far as the City deciding that

3   maybe they want to pay him for his missing sunglasses, well if

4   they want to sweeten the pot and talk about giving him back

5   all of that, the keys, the glasses and the $6,737 that's a

6   different story, Ms. Seligman, but don't be telling me that

7   you've never heard of the fancy sunglasses he had but you'll

8   think about whether or not they'll compensate for the fancy

9   sunglasses which probably -- Mr. May-Shaw, I think you said

10  they were $2,500 sunglasses somewhere?

11         MR. MAY-SHAW:  2,400, yes.

12         THE COURT:  That's what I recall.  So --

13         MS. SELIGMAN:  I'm making the distinction not

14  because of the nature of the property.  I'm making the

15  distinction because I'm recognizing that in an ideal world

16  even though I can't explain what they did when they got the

17  property it should have been vouchered separately.  So I

18  understand when one person went to return the property because

19  both of their names are on the voucher all of the property was

20  returned to the person who appeared at the precinct or

21  wherever they went to get the property back.

22         THE COURT:  Except for the $6,700.

23         MR. MAY-SHAW:  And the glasses weren't -- they

24  weren't returned to Erica because at the time when she came

25  they had to split the stuff up.  Everything that was vouchered

24

1  came out of that vehicle.  Not from my pocket or off of my
2  face.  My glasses were on my face when they took them off of
3  my face.  My keys were in my pocket.  They may have gave her
4  the keys but they didn't give the money back or the glasses.
5          And I don't understand what happened and that was
6  the issue with one of the things we argue was the inventory
7  search was invalid and in violation of the Fourth Amendment
8  because all that stuff got vouchered afterwards, you know, and
9  they never even during the suppression hearing, at the MAP
10 hearing she never even said that she vouchered the property.
11 Everything was looking like she was rummaging around for
12 evidential kind.
13          THE COURT:  I am --
14          MS. SELIGMAN:  Can we get --
15          THE COURT:  Excuse me?
16          MS. SELIGMAN:  Can we get a copy of the power of
17 attorney that plaintiff's mother presented to the property
18 clerk?
19          THE COURT:  Did you already send that in, Mr. May-
20 Shaw?
21          MR. MAY-SHAW:  Actually I do have a -- I have one
22 here and I can make a copy of it and send it.  Yes, I can do
23 that.
24          THE COURT:  So --
25          MS. SELIGMAN:  Do you know if it's -- may I ask

25

1    if --

2            THE COURT:  Excuse me, Ms. Seligman, I'm going to

3    have to leave because I have another conference and I'm going

4    to look for pro bono counsel for Mr. May-Shaw.  So I don't

5    want you to start making demands of him in discovery.  I do

6    think that this is an issue the City should consider because

7    from August 1st until October 27th if he got a property

8    release he should have been able to get his property back and

9    the warrant coming October 27th does not in my mind give the

10   City property clerks the authority from August to hold on to

11   his property.

12           So, Mr. May-Shaw, I will look for pro bono counsel

13   for you.  Let me see if we have -- we have no phone number for

14   you so that's going to be a difficulty.  They're going to have

15   to ask for permission to get in touch with you if I can find

16   anybody who would be willing to speak to you and if somebody

17   does contact you and say that they're a pro bono attorney

18   considering the case please cooperate with them.  Usually the

19   people that I try to find counsel for are at least in the

20   system in New York State.  It's unusual that I have somebody

21   who's in Michigan.  So it may be another obstacle but I will

22   make a diligent effort to try to find pro bono counsel to

23   address what I think may be a systemic or custom policy or

24   practice of the City of New York regarding policy on property

25   returned to people who have been arrested.

26

1          So, again, Mr. May-Shaw, bear with us.  Anything

2   further today, sir, before we adjourn?

3          MR. MAY-SHAW:  No, ma'am.

4          THE COURT:  Anything further today, Ms. Seligman or

5   Ms. Millar?

6          MS. SELIGMAN:  No, Your Honor.

7          MS. MILLAR:  No, Your Honor.  Thank you.

8          THE COURT:  I will also order a copy of today's

9   transcript to be made part of the file.

10          Ms. Millar, Ms. Seligman is very passionate.

11   [Inaudible] stays back a little bit more.  I think, Ms.

12   Millar, you handled yourself extremely well in this

13   litigation.  I wish I spoke more with you today but there will

14   be future conferences.

15          Ms. Seligman, again, holding up Heck v. Humphrey

16   just got me going.  I apologize if I got too passionate with

17   you but I cannot see that a problem that happens in August of

18   2017 in any way or any measure -- yes, the money might have

19   been seized if it was given back to him in August.  It could

20   have been spent too but it was his and it was taken from him

21   at the precinct and it doesn't undermine the validity of the

22   conviction in March in any way, shape or form.  In fact, he

23   was vindicated of the charges in New York.  That's why the

24   property should have been released.

25          With that, we are adjourned.  Thank you.

27

1   (Proceedings concluded at 9:39 a.m.)

2                              *  *  *  *  *

28

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5  _____

6                          Shari Riemer, CET-805

7  Dated:  May 21, 2018

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25