**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

CHRISTOPHER MAY-SHAW,

               Plaintiff,

     - against -

THE CITY OF NEW YORK, POLICE OFFICER
CANDICE SMITH, *Shield #725*, SERGEANT
BRUNO PIERRE, *Shield #3385*, POLICE OFFICER
DANIEL O'HARE, *Shield #17735*, POLICE
OFFICER MATTHEW KANCLER, *Shield #24243*,
SERGEANT ANTHONY BLUM, *Shield #20360*,
SERGEANT DAVID ZAYAS, *Shield #2577*,
DETECTIVE CHRISTIAN VILLACIS, *Shield #5498*,
DETECTIVE LAWRENCE LAVERTY, *Shield #3639*,
and DETECTIVE JOHN DENORA, *Shield #4777*,

               Defendants.

17-CV-5591 (EK) (LB)

**SECOND AMENDED**
**COMPLAINT AND**
**DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

JURISDICTION AND VENUE ................................................................................6

PARTIES .....................................................................................................................7

FACTUAL BACKGROUND ...................................................................................9

I.    THE JUNE 2016 WRONGFUL ARREST AND SUBSEQUENT MALICIOUS PROSECUTION OF MR. MAY-SHAW ...........................................................9

      A.    Mr. May-Shaw is arrested without probable cause by officers of the NYPD's 67th Precinct for being a passenger in a vehicle pulled over for an alleged traffic violation and possibly invalid license plate. ....................................................9

      B.    Mr. May-Shaw is maliciously prosecuted and illegally detained for approximately 12.6 months before the case against him is dismissed on account of his wrongful arrest and the incredible sworn testimony of Officer Smith, in which she offered contradictory accounts of several key facts. ..............14

      C.    Mr. May-Shaw is subjected to financial, emotional, and physical hardship, including abhorrent prison conditions, while fighting the improper criminal charges against him. ...............................................................18

II.   THE AUGUST 2016 WRONGFUL ARREST AND SUBSEQUENT PROSECUTION OF MR. MAY-SHAW .......................................................19

      A.    Mr. May-Shaw is surveilled based on an alleged tip from an anonymous informant and unlawfully arrested and searched for "making eye contact with" an officer and then "plac[ing] [a] backpack inside an enterprise rental car" (*D00075-76). ...............................................................20

      B.    Mr. May-Shaw is prosecuted for over seven months on bogus charges stemming from his unlawful arrest until the DA's Office moves *sua sponte* to dismiss the case in light of "stop and search issues" and the inability to "prove guilt." .............................................................................24

III.  THE REPEATED AND EGREGIOUS VIOLATIONS OF MR. MAY-SHAW'S DUE PROCESS PROPERTY RIGHTS .........................................................25

      A.    As a result of his June 2016 arrest, Mr. May-Shaw's property was wrongfully seized without probable cause, and his due process notice rights were violated. ...............................................................................26

B.    After his second arrest, Mr. May-Shaw's due process property rights were again violated, as additional property of his was seized and he was given insufficient notice of the procedures by which he could reclaim it, and good faith attempts to recover his property were rebuffed. ...............................................28

C.    Prior to Mr. May-Shaw's arrests, the City had notice of the NYPD's pattern and practice of providing constitutionally deficient procedures for vouchering, safeguarding, and returning property. ...................................................30

CLAIMS FOR RELIEF ..................................................................................................33

RELIEF REQUESTED....................................................................................................39

JURY DEMAND ...........................................................................................................40

Plaintiff Christopher May-Shaw,[1] by his attorneys, Kramer Levin Naftalis & Frankel LLP, and pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202, brings this action to redress violations of his Fourth and Fourteenth Amendment Rights under the United States Constitution, and alleges, based on personal knowledge as to his own conduct and otherwise on information and belief, as follows:[2]

## PRELIMINARY STATEMENT

1.      Mr. May-Shaw suffered severe harm as a result of unlawful conduct by officers from the 67th Precinct of the New York Police Department ("NYPD").[3] In the summer of 2016, Mr. May-Shaw was unjustly targeted and twice falsely arrested by the NYPD. He was then charged with supposed offenses and maliciously prosecuted and wrongfully imprisoned for more than a year while defending himself. Tellingly, both criminal cases against Mr. May-Shaw were dismissed before trial: the first for lack of any credible evidence against him; and the second, at the request of the prosecutor, in recognition of serious stop and search issues and inability to prove his guilt. During this same period, the NYPD "lost" approximately $10,000 of Mr. May-Shaw's money and numerous other valuables after failing to provide him, as required by the due process clause of the U.S. Constitution, with vouchers or other notice of procedures to reclaim his property.

2.      Mr. May-Shaw's first wrongful arrest occurred in June 2016, when he was traveling in a vehicle that NYPD officers pulled over for supposedly having a forged license plate (never confirmed) and illegally tinted windows (later conclusively disproven). The driver

---

[1] Plaintiff originally filed this action under the name "Robert Hogan (a.k.a. Christopher Payton May-Shaw)." With the Court's permission, during an August 26, 2020 status conference, the parties agreed to modify the case caption to include Plaintiff's legal name only: Christopher May-Shaw.

[2] This complaint consolidates actions pending in this Court under docket numbers 17-CV-5591 and 19-CV-3416. The previously operative complaints in those actions are annexed hereto as Exhibits 1 and 2, respectively.

[3] References to the NYPD and/or the 67th Precinct herein include all members of the NYPD police force on active duty and assigned to the 67th Precinct at any point between June 15, 2016 and October 27, 2017, including, without limitation, Defendants Smith, Pierre, O'Hare, Kancler, Blum, Zayas, Villacis, Laverty, and Denora.

could not produce registration or proof of insurance for the vehicle because it was in transit from the seller to the buyer, and the vehicle's temporary license plate number allegedly did not show up in the database the arresting NYPD officer purported to search.

3.     Although Mr. May-Shaw was just a rear-seat passenger who specifically informed the officers that that he did not own the vehicle, he was arrested on the spot and searched without probable cause. The arresting officer then impounded the vehicle. The subsequent inventory search of this vehicle, which the arresting officer's supervisor allowed her to conduct alone, with no observers present, allegedly led to the discovery of a handgun in the vehicle, although the arresting officer later gave shifting accounts of where in the vehicle it was allegedly found.

4.     In the criminal complaint that followed, the arresting officer initially stated that she had located the handgun in the trunk of the vehicle. However, when called to testify before a grand jury and at a later suppression hearing, she changed her story and claimed the handgun was under the driver's seat in front of where Mr. May-Shaw had been sitting. Mr. May-Shaw had never seen the handgun before, did not know that it was in the vehicle, and, to this day, has no idea how it came to be placed there. Notably, later DNA testing did not link Mr. May-Shaw to the handgun.

5.     From her searches of both Mr. May-Shaw's person and the impounded vehicle, the arresting officer attributed the following contraband to Mr. May-Shaw: less than half an ounce of marijuana, four forged driver's licenses, and the loaded handgun.

6.     In addition to the contraband, NYPD records confirm that the arresting officer seized from Mr. May-Shaw: electronic devices, a handbag, sunglasses, a suitcase full of clothing and other travel items, a folder of documents including three receipt books, a set of keys, and $6,747 in cash. Although officers from the 67th Precinct invoiced other currency found inside the vehicle as arrest evidence, Mr. May-Shaw's $6,747, sunglasses, and all of his other documents,

with the exception of one of his three receipt books, were not invoiced and are now "missing." And Mr. May-Shaw was never given voucher receipts for any of his property, as required by law.[4]

7.      After his June 2016 arrest, Mr. May-Shaw was maliciously prosecuted by the City of New York for over 13 months. During that time, the arresting officer not only provided testimony about the discovery of the handgun that was not credible, but also falsely stated during a suppression hearing that Mr. May-Shaw had claimed ownership of the impounded vehicle prior to his arrest. But none of the NYPD's contemporaneous documents support her contention, ███ ████████████████████████████████████████████████ As the presiding Justice ultimately found in suppressing *all* evidence on this issue, if Mr. May-Shaw had actually claimed ownership: "It would have been incumbent on the officer in the exercise of her duties to document this statement." (D00458).

8.      The arresting officer also falsely testified at the suppression hearing that Mr. May-Shaw had never presented any documentation for the vehicle. But the NYPD had in its possession Mr. May-Shaw's inventoried receipt book, with a handwritten transaction receipt confirming that he had been hired to transport the vehicle from the seller to a buyer. Furthermore, notwithstanding the arresting officer's hearing testimony that she had tested the vehicle's windows and determined that they were illegally tinted, she never produced any documentation of the test results, and a neutral tester later determined that the tints were lawful. Accordingly, the presiding Justice in Mr. May-Shaw's criminal case suppressed all of this evidence too, again stressing that the arresting officer's "testimony lacks credibility" and, most significantly, that "[t]here was not probable cause to arrest [Mr. May-Shaw]." (D00458-9).

---

[4] Mr. May-Shaw's suitcase was never invoiced and went missing for a period of time as well, but it was eventually located and returned to him.

9.     On July 21, 2017, the criminal case against Mr. May-Shaw arising from his June 2016 wrongful arrest was dismissed in its entirety and sealed.

10.     Mr. May-Shaw's second wrongful arrest by the NYPD occurred in August 2016, while he was in New York to contest the criminal case pending from his earlier wrongful arrest. This time, the NYPD's purported justification for Mr. May-Shaw's unlawful arrest was him allegedly placing a backpack in his girlfriend's rental car after supposedly "making eye contact with" a police officer. What actually happened, however, was that officers from the 67th Precinct traveled halfway across Brooklyn, miles outside of that Precinct's boundaries, to surveil the outside of Mr. May-Shaw's hotel, in supposed reliance on an anonymous tip they had received about there being someone in the area with drugs stashed in a duffle bag. When Mr. May-Shaw and his girlfriend left the hotel and began walking down the street, they were promptly arrested after passing the officers, who had been lying in wait inside an unmarked police car.

11.     While Mr. May-Shaw was handcuffed, the officers searched his girlfriend's rental car, which was parked outside of the hotel. In the process, they seized Mr. May-Shaw's backpack from the vehicle, and all of its contents. At the precinct, the officers searched and seized additional property from Mr. May-Shaw's person, before no less than four officers interrogated him. Tired and scared (from this arrest and his prior trying experience with the NYPD), Mr. May-Shaw signed an authorization form permitting NYPD officers to search his hotel room as well. There, the officers seized his suitcase, clothing, electronic devices, accessories, and currency. Mr. May-Shaw was never provided a voucher receipt for any of this property, and none of the items taken was ever returned to him, despite numerous later attempts to reclaim them.

12.     Following his August 2016 unlawful arrest, Mr. May-Shaw was prosecuted for over seven months based on a criminal complaint endorsed by two of the arresting officers. In

that complaint, the arresting officers contended that the decision to arrest Mr. May-Shaw came after he made eye contact with one of them and turned around to dispose of his backpack. But Mr. May-Shaw was not carrying a backpack when he left his hotel and did not turn around or otherwise react to the officers—he simply walked past the unmarked car they were sitting in. Upon information and belief, video footage recovered from the scene of the arrest contradicts the officers' version of events. But rather than disclose to Mr. May-Shaw the presumably damning footage of his arrest, as ordered by the presiding Justice, the District Attorney moved *sua sponte* to dismiss the case, which was so ordered on March 16, 2017.

13.     Although that Justice several times asked for the reason for this dismissal to be put on the record, the prosecution would only say that its office had insufficient evidence to prove Mr. May-Shaw's guilt. Defense counsel noted for the record, however, that the prosecution had separately informed him of certain "stop and search issues" leading to the dismissal. (3/16/17 Supreme Court Transcript at 3, *People v. Mayshaw*, Ind. No. 6850/16 (Sup. Ct. N.Y. Cty.)).

14.     In connection with his June 2016 and August 2016 arrests and subsequent criminal cases (dismissed, respectively, in July 2017 and March 2017), Mr. May-Shaw spent roughly 12.6 months in pre-trial detention at Rikers Island, during which time he made approximately 32 different court appearances.

15.     Instead of releasing and returning Mr. May-Shaw's property to him at the conclusion of his cases, as instructed by the DA's Office, the NYPD and, upon information and belief, other City employees, continued to hold nearly all of his property. From March to October 2017, Mr. May-Shaw and his mother and Power of Attorney, Ms. Vivian Lisa Buggs, made numerous attempts to reclaim this property, but all of their efforts stalled because, among other things, they had never received from the NYPD any of the required vouchers explaining the

process for reclaiming property.

16.     The serious abuses Mr. May-Shaw suffered in connection with his arrests and prosecutions epitomize the NYPD's longstanding pattern and practice of violating due process rights while retaining individuals' seized property. For years prior to Mr. May-Shaw's 2016 arrests, the NYPD has been providing arrestees and other citizens with inadequate notice for seizures and retentions of their property. Given this history of due process violations, the City of New York was, or should have been, on notice that Mr. May-Shaw's constitutional due process rights could be violated too (as they were). But the City took no steps to intervene and implicitly sanctioned the NYPD's unlawful conduct through its inaction and indifference.

## JURISDICTION AND VENUE

17.     This action arises under the Fourth and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. §§ 1983 and 1988.

18.     Subject matter jurisdiction is conferred by 28 U.S.C. §§ 1331 and 1343(a).

19.     This Court has general personal jurisdiction over the City of New York and each of the individual Defendants because, upon information and belief, all Defendants are domiciled in the state of New York. Additionally, Defendant City of New York is a municipal corporation existing by virtue of the laws of the State of New York; its nerve center is in this state, as its principal place of business is located in New York.

20.     This Court has jurisdiction and authority to award monetary damages on Plaintiff's claims pursuant to 42 U.S.C. § 1983. This Court also has the authority to declare the rights of the parties and to grant such other and further relief as may be deemed necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2202. And, under 42 U.S.C. § 1988, the Court has ample authority to award costs and attorneys' fees as well.

21.     Venue is proper here under 28 U.S.C. § 1391(b)(2) because the acts and omissions giving rise to Plaintiff's claims occurred in the Eastern District of New York.

**PARTIES**

22.     Plaintiff Christopher May-Shaw is a citizen of the United States, presently domiciled in Terre Haute, Indiana. During the events giving rise to this action, Mr. May-Shaw was physically located in New York.

23.     Defendant City of New York (the "City") is a municipal entity organized and existing under the laws of the state of New York. The City has established and maintains the NYPD as a constituent department or agency. At all relevant times, the City, acting through the NYPD, was responsible for the policies, practices, supervision, implementation and conduct of all NYPD matters and for the appointment, training, supervision and conduct of all NYPD personnel, including the Defendants specifically named herein.

24.     At all relevant times, NYPD Officer Candice Smith, Shield #725, was a member of the NYPD, acting in the capacity of agent, servant and employee of the City, and within the scope of her employment as such. She is sued herein in her official and individual capacities.

25.     At all relevant times, NYPD Sergeant Bruno Pierre, Shield #3385, was a member of the NYPD, acting in the capacity of agent, servant and employee of the City, and within the scope of his employment as such. On information and belief, Defendant Pierre was a decision maker responsible for training, supervising, and disciplining NYPD officers. He is sued herein in his individual capacity.

26.     At all relevant times, NYPD Officer Daniel O'Hare, Shield #17735, was a member of the NYPD, acting in the capacity of agent, servant and employee of the City, and within the scope of his employment as such. He is sued herein in his official and individual capacities.

27.     At all relevant times, NYPD Officer Matthew Kancler, Shield #24243, was a member of the NYPD, acting in the capacity of agent, servant and employee of the City, and within the scope of his employment as such. He is sued herein in his official and individual capacities.

28.     At all relevant times, NYPD Sergeant Anthony Blum, Shield #20360, was a member of the NYPD, acting in the capacity of agent, servant and employee of the City, and within the scope of his employment as such. He is sued herein in his individual capacity.

29.     At all relevant times, NYPD Sergeant David Zayas, Shield #2577, was a member of the NYPD, acting in the capacity of agent, servant and employee of the City, and within the scope of his employment as such. On information and belief, Defendant Zayas was a decision maker responsible for training, supervising, and disciplining NYPD officers. He is sued herein in his individual capacity.

30.     At all relevant times, NYPD Detective Christian Villacis, Shield #5498, was a member of the NYPD, acting in the capacity of agent, servant and employee of the City, and within the scope of his employment as such. He is sued herein in his individual capacity.

31.     At all relevant times, NYPD Detective Lawrence Laverty, Shield #3639, was a member of the NYPD, acting in the capacity of agent, servant and employee of the City, and within the scope of his employment as such. He is sued herein in his individual capacity.

32.     At all relevant times, NYPD Detective John Denora, Shield #4777, was a member of the NYPD, acting in the capacity of agent, servant and employee of the City, and within the scope of his employment as such. He is sued herein in his individual capacity.

## FACTUAL BACKGROUND

I.   **THE JUNE 2016 WRONGFUL ARREST AND SUBSEQUENT MALICIOUS PROSECUTION OF MR. MAY-SHAW**

   A.   Mr. May-Shaw is arrested without probable cause by officers of the NYPD's 67th Precinct for being a passenger in a vehicle pulled over for an alleged traffic violation and possibly invalid license plate.

33.   On June 15, 2016, Mr. May-Shaw, his then-girlfriend Patricia Morris, and Mario Gadion were transporting a Porsche from out-of-state car broker Bruce Jones to its new owner in Brooklyn.[5] Ms. Morris drove the Porsche, Mr. Gadion sat in the front passenger seat, and Mr. May-Shaw was behind Ms. Morris in the rear-left passenger seat. (11/16/16 Suppression Hearing Transcript ("Supp. Tr.") at 10-12, *People v. Hogan*, Ind. No. 5247/16 (Sup. Ct. N.Y. Cty.)).

34.   Around 4:25 PM, while headed southbound on Nostrand Avenue at the intersection of Nostrand Avenue and Avenue D in Brooklyn, a marked police van pulled behind the Porsche, and both vehicles stopped at a stoplight. (*Id.* at 8-9). Almost immediately, the officers inside—Officer Candice Smith and her partner Sergeant Bruno Pierre—activated the van's lights and sirens and signaled the Porsche to pull over. (*Id.* at 7-8, 9, 23-25). At the time, these officers were en route to a civilian complaint of "illegal vending" on the corner of Newkirk Avenue and Nostrand Avenue, one block away. (*Id.* at 26). But Officer Smith, who was driving the van, told Sergeant Pierre that she wanted to stop the Porsche instead of continuing to their other destination, and Sergeant Pierre consented. (*Id.* at 26-27).

35.   According to Officer Smith, she stopped the Porsche for two reasons. While driving behind the Porsche, she observed "lettering" on the temporary Texas license plate that "appeared to be fraudulent" and "not consistent" with the type of lettering normally seen on a

---

[5] Alternate spellings of Mr. Gadion's last name include Gedeon and Gaedion.

"valid temporary license plate." (*Id.* at 9).  But, at subsequent hearings, Officer Smith offered no testimony or evidence of any learning from her police training or other specialized knowledge she had with respect to the appearance of authentic temporary license plates, let alone plates from Texas in particular.

36.     Officer Smith also claimed to notice prior to stopping the Porsche that all four side windows of the vehicle were "excessively tinted," and that she "couldn't see the driver at all through the window." (*Id.* at 9). But, on information and belief, Officer Smith had no opportunity to assess the car's side windows from her vantage point at the wheel of a police van stopped directly behind the Porsche.

37.     After stopping the Porsche, Officer Smith emerged from the police van and approached the Porsche's driver-side front window, while Sergeant Pierre moved toward the front passenger side. (Supp. Tr. at 27, CM Depo. at 46). Ms. Morris rolled down her window from the driver's seat. (Supp. Tr. at 27). ███████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████ When Officer Smith asked who owned the Porsche, Ms. Morris told her that she did not know. (Supp. Tr. at 14).

38.     Ms. Morris and Officer Smith continued to discuss the vehicle's ownership until Mr. May-Shaw interjected to explain that the Porsche was being transported from Michigan to its owner in New York, and that officers may have to run the vehicle's license plate number to obtain the precise name of the owner and his insurance provider. (*Id.* at 11-13, D00211, CM Depo. at 48). Officer Smith cautioned Mr. May-Shaw that she was speaking only to the driver, and then continued to question Ms. Morris about the identity of the Porsche's owner. (Supp. Tr. at 13-14, CM Depo. at 49). After some time passed, Mr. May-Shaw again interjected to try to

explain that he had been paid by a broker to transport the vehicle to its buyer. Officer Smith asked whether Mr. May-Shaw had "any documentation for the vehicle," and, in response, he began to search through a folder of various documents he had in the back seat of the car. (Supp. Tr. at 14).

39.     To be clear, at no point during this traffic stop or subsequently did Mr. May-Shaw claim ownership of the vehicle; to the contrary, he expressly told Officer Smith and others on the scene that the car was in the process of being delivered to its owner. (D00128-29, D00211).

40.     While Mr. May-Shaw was searching for a receipt for the transfer of the Porsche, Officer Smith and Sergeant Pierre walked to the back of the car to examine the temporary Texas license plate more closely. (Supp. Tr. at 14). Up to six other officers—including Earl Rochester, James Berk, Daniel O'Hare, and Kevin Francis—arrived on the scene at this time and huddled with Officer Smith and Sergeant Pierre near the rear of the Porsche to debate the authenticity of the license plate. (CM Depo. at 52, 57-58, D00360, D00152-59). Officer Smith removed the license plate from the back of the Porsche so that all of the officers on the scene could inspect it together. (*Id.*).

41.     Officer Smith then allegedly ran the license plate number through a search engine available on her work cell phone that yielded no results. (Supp. Tr. at 14-15). She ran the VIN number affixed to the dashboard of the car too and allegedly learned that it was associated with a 2011 Porsche. (*Id.* at 15-16). Importantly, as Officer Smith has since acknowledged, the search result details did *not* list the Porsche as being stolen or provide any other basis for her to believe the Porsche had been stolen. (*Id.* at 34). Nevertheless, based on a minor discrepancy between the year associated with the VIN (2011) and the year listed on the Porsche's temporary Texas license plate (2013), Officer Smith decided she would arrest both Mr. May-Shaw and Ms. Morris. (*Id.* at 15-16, D00364).

- 11 -

42.   ████████████████████████████████████████████

███████████████████████████████████████████████ He then called

his employer, Bruce Jones, and spoke with Mr. Jones over the phone, informing him that he, Ms.

Morris, and Mr. Gadion had been pulled over in Brooklyn and may need some assistance. (CM

Depo. at 50). A few minutes later, when Officer Smith approached the Porsche's driver-side

window again, Mr. May-Shaw told her that his employer was on the phone and available to

address any questions the officers had. (*Id.*). Officer Smith curtly told Mr. May-Shaw to end the

phone call; he complied. (*Id.*).

43.   Officer Smith then opened the front driver's side door of the Porsche and asked

Ms. Morris to step out. (*Id.* at 50-51; Supp. Tr. at 35). As soon as Ms. Morris exited the vehicle,

Officer Smith handcuffed her, escorted her to the police van, and placed her inside. (CM Depo.

at 51-54). Officer Smith then approached the rear driver's side door of the Porsche and, along

with Officer Rochester, asked Mr. May-Shaw to step out of the vehicle; he complied. (*Id.* at 54).

At the same time, Sergeant Pierre (and possibly one other officer) asked Mr. Gadion to exit the

vehicle. Mr. May-Shaw and Mr. Gadion were then directed to stand behind the Porsche near the

trunk; they complied. (*Id.* at 55-56).

44.   When Mr. May-Shaw exited the car, he was holding a manila file folder filled

with identification cards and other documents, including the receipt book with his receipt for the

Porsche. Officer Rochester took the folder from Mr. May-Shaw while Mr. May-Shaw pointed to

the receipt showing that he and Ms. Morris had been hired to transport the Porsche to Brooklyn.

████████████████████████████████████████████████

████████████████████████████████████████

45.     After looking through Mr. May-Shaw's papers, Sergeant Pierre asked Mr. Gadion to show identification, which he provided. (D00015). In notable contrast, none of the officers at the scene ever asked to see Mr. May-Shaw's identification. (CM Depo. at 51).

46.     Mr. May-Shaw then asked Sergeant Pierre why Ms. Morris was being arrested and how and when he could get her released. (CM Depo. at 54). Sergeant Pierre replied that Ms. Morris needed to "see a judge tonight" unless Mr. May-Shaw or Mr. Gadion wanted to "take her place." (*Id.*). Mr. May-Shaw replied, "[t]ake her place for what?" but received no response. (*Id.*).

47.     ███████████████████████████████████████████████████
████████████████████████████████████████ But Officer Smith told Mr. May-Shaw that he was "coming with" the officers to the precinct. (CM Depo. at 52). At Officer Smith's direction, Mr. May-Shaw was then handcuffed by Officer Rochester, escorted to a marked police car, and placed in its rear passenger-side seat while Officers Smith, Berk, and O'Hare and Sergeants Pierre and Francis all observed. (*Id.* at 55). Mr. May-Shaw implored the officers to explain why he was being arrested, but he was given no answer (*id.* at 55)—because none of the officers at the scene had probable cause to arrest Mr. May-Shaw.

48.     Officer Berk then drove the marked police car back to the 67th Precinct while Officer Rochester sat in the back seat next to Mr. May-Shaw. (D00155, D00159). During the ride, Mr. May-Shaw asked again why he was being arrested, and Officer Rochester told Mr. May-Shaw that he would find out when they got to the precinct. But at the precinct, Mr. May-Shaw was unlawfully searched and his property was unlawfully seized without being vouchered. He was then held at that precinct until being transferred to central booking.

49.     While Mr. May-Shaw's arrest was still in progress, Officer Smith determined that NYPD officers should take the Porsche back to the 67th Precinct not only to "secure that

vehicle," but also because Officer Smith felt "[she] had to perform an inventory search of the vehicle." (Supp. Tr. at 16).

      B.    <u>Mr. May-Shaw is maliciously prosecuted and illegally detained for approximately 12.6 months before the case against him is dismissed on account of his wrongful arrest and the incredible sworn testimony of Officer Smith, in which she offered contradictory accounts of several key facts.</u>

50.    From June 15, 2016, when he was first arrested, until July 21, 2017, when his underlying criminal case was dismissed—more than a year—Mr. May-Shaw was maliciously prosecuted based on numerous false statements by Officer Smith.

51.    In her sworn statement of complaint, prepared within hours of the arrest, Officer Smith affirmed as the arresting officer that she "recovered a 9MM firearm loaded with approximately 13 rounds of ammunition *from the trunk of the [] vehicle.*" (D00002-03) (emphasis added). Officer Smith also acknowledged by initialing a warning statement on the complaint that "[f]alse statements made in this document are punishable as a Class A misdemeanor pursuant to Section 210.45 of the Penal Law." (*Id.*).

52.    █████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ During the suppression hearing, Officer Smith again repeatedly asserted—in contravention of her contemporaneous written account of the arrest—that the gun was found underneath the driver's seat of the Porsche. (Supp. Tr. at 2-3, 18, 39-40).

53.    Mr. May-Shaw had never seen the handgun before; he had no knowledge of any gun inside the Porsche; and he had no idea how it allegedly came to be inside the vehicle. (CM Depo. at 89). Notably, the New York Office of the Chief Medical Examiner issued a laboratory report during the criminal case concluding that Mr. May-Shaw's DNA could not be reliably

linked to the DNA found on the handgun. (12/27/16 Lab Report at 1, *People v. Hogan*, Ind. No. 5247/16 (Sup. Ct. N.Y. Cty.)).

54.     In suppressing all evidence in the case against Mr. May-Shaw, Justice Simpson emphasized that inconsistent testimony regarding the location of the recovered handgun—the single most important piece of contraband alleged in Mr. May-Shaw's case—was "significant and [brought] into question the reliability of the officer's testimony." (D00459).

55.     Upon information and belief, despite making these directly conflicting statements about the handgun under oath, Officer Smith is still employed by the NYPD (D00177) and has faced no repercussions; while Mr. May-Shaw has suffered greatly.

56.     Officer Smith also provided inconsistent and unreliable testimony concerning other key facts of the case. For example, she falsely stated that Mr. May-Shaw had claimed to own the Porsche. To wit, during the suppression hearing, Officer Smith continually averred that Mr. May-Shaw had told her: "It's my vehicle. I'm transporting it from *(sic)* New York to Michigan." (Supp. Tr. at 2, 11, 30-31). But none of the relevant NYPD officers' contemporaneous written accounts, including Officer Smith's own, indicate that Mr. May-Shaw said that *he* owned the Porsche (*id.* at 31, D00002, D00129, D00150, D00211); and Mr. May-Shaw denies ever making such a claim.

57.     ███████████████████████████████████████████████
███████████████████████████████████████████████ As Justice Simpson later noted: "[Officer Smith] has not been consistent in her testimony. She has not previously asserted that [Mr. May-Shaw] stated to her that it was his vehicle. This is a significant fact that had it occurred should have been recorded or asserted prior to the [suppression] hearing. It would have been incumbent on the officer in the exercise of her duties to document this statement."

(D00458). Instead, Officer Smith made this assertion only when called upon to defend the lack of any probable cause for Mr. May-Shaw's arrest.

58.     A third key fact Officer Smith gave incredible testimony about concerns the documentation Mr. May-Shaw provided for the Porsche. Officer Smith repeatedly testified under oath that Mr. May-Shaw never produced any documentation for that vehicle. ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ And, during the suppression hearing, Officer Smith again claimed that Mr. May-Shaw "failed to produce" "any documentation for the vehicle." (Supp. Tr. at 35).[6]

59.     However, reliable records establish that Mr. May-Shaw did in fact produce a receipt for the Porsche. (D00102, D00560). ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████

60.     Moreover, following Mr. May-Shaw's June 2016 arrest, the NYPD vouchered an "Adams Receipt Book" with three handwritten receipts verifying that Mr. May-Shaw had been paid $2,075 by "Broker Bruce" over the course of two weeks to deliver: a 2014 Jaguar between May 28-29, 2016; a 2013 S550 Mercedes Benz between June 3-4, 2016; and a 2013 Porsche Panamera between June 10-17, 2016—the exact same vehicle and date range implicated in his prosecution. (D00555-561). Defendant Officer Smith thus clearly had awareness of, and access

---

[6] Her memo book for the arrest also indicates that Mr. May-Shaw did not produce identification for the vehicle. (D00129).

to, a copy of the very receipt she incongruously maintained was never produced and does not exist. (D00560).

61.     Officer Smith also falsely testified that the windows of the Porsche were illegally tinted; they were not. During the suppression hearing, she claimed to have used a tintometer to test the Porsche's window tints and found that they only allowed 31% of light to pass through the glass. (Supp. Tr. at 19-20). She claimed the legal limit was at least 70%. (*Id.* at 20). But, when pressed, she admitted that she had no documents verifying the testing or evidencing her results. (*Id.* at 20). Subsequent tests of the Porsche's windows revealed that they actually *were* within the legal range. (D00457). And, upon information and belief, unlike Officer Smith's "results," documentation of the neutral tester's results was made available to Justice Simpson, who confirmed in her written decision that "[t]he tint of the windows on the vehicle was later found to have been lawful." (*Id.*).

62.     In sum, Justice Simpson repeatedly found that "Officer Smith was not credible" or "reliable." (D00458-59, 4/19/17 Court Transcript at 2, *People v. Hogan*, Ind. No. 5247/16 (Sup. Ct. N.Y. Cty.)). And, in suppressing all evidence in Mr. May-Shaw's criminal case, the judge deemed "the inconsistency and deficiencies in [Officer Smith's] testimony" to be fatal to the prosecution's attempt to establish, *inter alia*, probable cause for Mr. May-Shaw's arrest "given the lack of credible testimony provide[d] by the officer and the absence of significant facts concerning [Mr. May-Shaw's] relationship to the vehicle." (7/10/17 Decision & Order at 3-4, *People v. Hogan*, Ind. No. 5247/16 (Sup. Ct. N.Y. Cty.)).

63.     Notably, the DA's Office agreed to end its prosecution of Mr. May-Shaw after Justice Simpson emphasized on the record: "You don't have anything, that's the case." (7/9/17 Court Transcript at 3, *People v. Hogan*, Ind. No. 5247/16 (Sup. Ct. N.Y. Cty.)).

C.  Mr. May-Shaw is subjected to financial, emotional, and physical hardship, including abhorrent prison conditions, while fighting the improper criminal charges against him.

64.    Mr. May-Shaw has endured substantial hardship as a result of the extended prosecution that followed his unjustified June 2016 arrest. Among other things, he was forced to: raise funds and post a $75,000 bail; hire a defense attorney for approximately $15,000; defend that criminal case at 25 court appearances; and spend over a year in pretrial detention at Rikers Island. (CM Depo. at 78, D00013, Webcrims Docket Sheet for Case No. 05247-2016).

65.    In total, Mr. May-Shaw was unlawfully imprisoned in and by the City for about 378 days. Specifically, Mr. May-Shaw was incarcerated for about 33 days in June-July 2016 until he was released on bail (7/18/16 Court Bond Certificate), and then held for 345 more days starting in August 2016, after being remanded back into state custody following his second wrongful arrest (discussed in detail below), until July 21, 2017 when his final New York state criminal case was dismissed and related bail conditions were lifted. (CM Depo. at 80, 83; 8/18/16 Court Bail Status Notice; 7/21/17 Court Transcript at 5, *People v. Hogan*, Ind. No. 5247/16 (Sup. Ct. N.Y. Cty.)).

66.    The conditions of his confinement over this period were appalling. The holding cells at the 67th Precinct were "terrible with feces . . . and urine," and Mr. May-Shaw was forced to remain in a feces-filled holding cell for 4-5 hours following his June 2016 arrest. (CM Depo. at 68). At Rikers, Mr. May-Shaw was housed at the Otis Bantum Correctional Center, where he spent 2-3 days confined with 30-40 other men in a single cell that, upon information and belief, was only intended to house at most 15 people and filled with rotting food and feces. (*Id.* at 107-08).  Mr. May-Shaw was not given a bed for about three days, and thus forced to sleep on the floor. (*Id.*). Inside the overcrowded cell, other men were experiencing symptoms of heroin withdrawal and throwing up on the floor. (*Id.*). Mr. May-Shaw continuously complained about

these conditions to Corrections officers, but his pleas fell on deaf ears. (*Id.*). Eventually, he was transferred out of that cell. (*Id.*).

67.     While imprisoned at Rikers and litigating his criminal case, Mr. May-Shaw also had to seek the assistance of his family and friends, some of whom traveled from Michigan to New York to help support him throughout his prosecution. (*Id.* at 78, 97-102, 7/12/17 May-Shaw Letter to Property Clerk and Enclosures). In particular, his mother, Ms. Buggs, traveled back and forth from her home in Grand Rapids, Michigan to New York City *nine* times to try to help with Mr. May-Shaw's bail logistics, court appearances, and attempts to retrieve his seized property. Upon information and belief, she made seven of these trips by plane and drove twice, renting a car once and using her own vehicle on the other occasion.

## II.    THE     AUGUST     2016     WRONGFUL     ARREST     AND     SUBSEQUENT PROSECUTION OF MR. MAY-SHAW

68.     On or about July 18, 2016, Mr. May-Shaw was released on bail from imprisonment for his June 2016 arrest, after a family member in Grand Rapids, Michigan put his house up as security with a bondsman. (7/18/16 Court Bond Certificate). Immediately following his release, Mr. May-Shaw traveled to West Virginia to reunite with his girlfriend, Ms. Morris. (CM Depo. at 78-79).

69.     On August 8, 2016, Mr. May-Shaw and Ms. Morris returned to New York to: check in with Mr. May-Shaw's bail bondsman; attempt to reclaim seized property; and pay his defense attorney. (D00012, *D00080,[7] CM Depo. at 79, 81). The couple stayed at the Holiday Inn Brooklyn Downtown Hotel (8/8/16-8/11/16 Holiday Inn Receipts)—outside of which they were wrongfully arrested the following day.

---

[7] Citations to Bates-stamp production numbers beginning "*D" (rather than just "D") refer to documents Defendants provided with their pre-production focused on Mr. May-Shaw's August 2016 arrest and pursuant to this Court's October 29, 2019 Order. (Order, *Hogan v. City of New York, et al.*, No. 17 CV 5591 (E.D.N.Y. Oct. 29, 2019), ECF No. 99).

A.     Mr. May-Shaw is surveilled based on an alleged tip from an anonymous informant and unlawfully arrested and searched for "making eye contact with" an officer and then "plac[ing] [a] backpack inside an enterprise rental car" (*D00075-76).

70.     On August 9, 2016 at approximately 2:00 PM, 67th Precinct Sergeant Anthony Blum allegedly "receive[d] intel from [an] SOI [i.e., an informant] concerning the transportation of narcotics from [the] Holiday Inn [at] 300 Schermerhorn Street." (*D00088). Sergeant Blum claimed that his Precinct received this tip directly, even though 300 Schermerhorn Street is about four miles outside of the 67th Precinct's boundaries and three Precincts away—for all intents and purposes, on the opposite side of Brooklyn.

71.     An internal DA's Office memo describes the tip as follows: "[T]he 67 Precinct received multiple anonymous phone calls regarding a male that was selling large amounts of drugs from a hotel and a nearby Ihop. The caller identified the hotel. The caller first stated that the drugs would be inside a backpack, then called back to say the drugs would be in a duffel bag." (D00781).

72.     Upon information and belief, the caller: was completely anonymous, never identifying himself or herself; provided no description of the alleged drug-dealer other than to say that he was a male; and never specified the particular drug being sold or any other details of the alleged sales. Moreover, as noted in the DA's memo, the informant was unsure where the drugs were located and gave no description of either the initially-claimed backpack or later-claimed duffel bag that he thought might contain them. Importantly, upon information and belief, the informant also provided no basis for his or her knowledge of the alleged unlawful activities—so the 67th Precinct was in no position to assess either the credibility of the informant or the veracity of the tip received.

73.     Nevertheless, that afternoon Sergeant Blum allegedly organized a police operation to investigate the anonymous tip. (*D00088). At 2:00 PM the next day, August 10, 2016, Sergeant Blum and Officer Matthew Kancler drove about four miles across Brooklyn, from their Precinct to 300 Schermerhorn Street, to supposedly investigate the informant's allegations. (*Id.*, *D00086). Upon information and belief, Sergeant Blum and Officer Kancler met up with Detective Christian Villacis and then waited together in an unmarked police car outside of the Holiday Inn Hotel. Upon information and belief, Sergeant David Zayas, Detective John Denora, and Detective Lawrence Laverty waited nearby, within eyesight of the hotel's entrance.

74.     Around 3:20 PM, Mr. May-Shaw and Ms. Morris exited that Holiday Inn, turned left, and started walking down the sidewalk. After venturing about 30 yards, Mr. May-Shaw realized he had forgotten to bring his state ID with him. He asked Ms. Morris to unlock their rental car—which was legally parked in front of the Holiday Inn's main entrance—so that he could retrieve the ID from his backpack inside the vehicle. Ms. Morris clicked the button on her key fob remote to unlock the car's doors, and Mr. May-Shaw walked towards the vehicle. He opened the rear passenger door, opened his backpack, and took out his ID. Then he shut the door, Ms. Morris re-locked the car, and Mr. May-Shaw and Ms. Morris resumed walking side-by-side down the sidewalk. Unbeknownst to them, as they walked about 20 more yards, they were approaching the front of the 67th Precinct officers' unmarked and undercover police car. They continued walking and passed it.

75.     Upon information and belief, when Mr. May-Shaw and Ms. Morris cleared the rear of the police car, all three NYPD Defendants inside—Sergeant Blum, Officer Kancler, and Detective Villacis—promptly exited their vehicle and, without probable cause, unlawfully arrested and searched and seized possessions from both Mr. May-Shaw and Ms. Morris (*D00084).

76.     Officer Kancler shouted at Mr. May-Shaw and Ms. Morris and demanded that they stop moving. Then, he gave Mr. May-Shaw a pat down while another officer patted down Ms. Morris. Officer Kancler took cigarettes out of Mr. May-Shaw's front pocket and a photo ID from his back pocket.

77.     Officer Kancler then handcuffed Mr. May-Shaw and said to the other officers at the scene, in sum and substance: "I know who this is—this is Robert Hogan." Mr. May-Shaw told him that his name was not Robert Hogan. Officer Kancler asked for his name, and Mr. May-Shaw noted in response that Officer Kancler had his ID. Upon information and belief, during Mr. May-Shaw's arrest and search, four to five other officers were standing nearby watching and assisting—including Sergeant Zayas, Detective Villacis, Detective Denora, and Detective Laverty.

78.     Around this same time, Sergeant Blum placed Mr. May-Shaw in the back of a police car—detaining him unlawfully, as neither the anonymous informant's tip nor the activities observed outside the hotel provided the requisite probable cause for an arrest. Mr. May-Shaw stayed in that police car waiting for about 30 to 35 minutes, while Detective Denora stood outside the rear passenger-side door to keep Mr. May-Shaw inside and to block Mr. May-Shaw's view of other officers' handling of Ms. Morris.

79.     Meanwhile, Officer Kancler took Ms. Morris's car keys from her purse and walked back up the street to the rental vehicle. With both Mr. May-Shaw and Ms. Morris detained in police vehicles, Officer Kancler then unlawfully entered and searched the rental car without probable cause, a warrant, or consent. (*D00086). He unlocked the rental car, rifled through the backpack he found in the back seat, and seized from it Mr. May-Shaw's sunglasses and currency. (CM Depo. at 86). Upon information and belief, Sergeant David Zayas supervised

this search, while Sergeant Blum, Detective Villacis, and Detective Lawrence Laverty assisted. Additional personnel, including Detective John Denora, remained nearby watching and assisting.

80.    After the officers completed their initial search of the rental car, one of the officers drove the police car holding Mr. May-Shaw back to the 67th Precinct.

81.    The NYPD's only purported basis for arresting and searching Mr. May-Shaw and seizing his possessions in August 2016 was a tip allegedly received from an anonymous informant that some male at the Holiday Inn Hotel could have a duffel bag containing drugs. The informant said nothing about a rental car. The informant specifically withdrew an earlier claim that drugs could be found in a backpack. Upon information and belief, the officers' written accounts of Mr. May-Shaw's arrest make no mention of any duffel bag. And, perhaps more critically, upon information and belief, none of the officers at the scene of this arrest has ever indicated why they decided Mr. May-Shaw was the male referenced by the anonymous informant, as there were surely many males entering and exiting the hotel with bags of luggage that could have fit the alleged tipster's broad description. Simply put, no aspect of the informant's tip established the requisite probable cause for Mr. May-Shaw's (or Ms. Morris's) arrest.

82.    The events allegedly observed outside of the Holiday Inn did not establish probable cause for Mr. May-Shaw's August 2016 arrest either—and, thus, the NYPD's subsequent searches and seizures from him were tainted. In his sworn complaint following the arrest, Officer Kancler merely alleged that it had appeared to Sergeant Blum that Mr. May-Shaw had made "eye contact" with him while carrying a backpack out of the hotel, and then doubled back towards the hotel to place that backpack into a nearby Enterprise rental car. (*D00077-78, *D00100). Based on this supposed conduct, Sergeant Blum and Officer Kancler decided to arrest

and search Mr. May-Shaw and Ms. Morris. But, as discussed below, that is not what happened outside the hotel; and, in any event, would not be enough to create probable cause.

> B. Mr. May-Shaw is prosecuted for over seven months on bogus charges stemming from his unlawful arrest until the DA's Office moves *sua sponte* to dismiss the case in light of "stop and search issues" and the inability to "prove guilt."

83. From August 10, 2016 to March 16, 2017, Mr. May-Shaw was prosecuted for charges stemming from his unlawful August 2016 arrest. To fight this case, he made five to seven court appearances and retained the services of a criminal defense attorney. (8/11/16 Sheinberg Notice of Appearance Form, Court Calendar Disposition Chart, Crims Appearance History).

84. Upon information and belief, for some or all of this same period, the DA's Office had video footage of Mr. May-Shaw's arrest that confirmed that the arresting officers lacked probable cause to arrest him. At a November 2016 court appearance, defense counsel stated on the record: "I understand the People in this case have some videos." (11/22/16 Court Transcript at 3, *People v. Mayshaw*, Ind. No. 6850/16 (Sup. Ct. N.Y. Cty.)). In response, the presiding Justice ordered the DA's Office to turn over the videos, and the ADA acknowledged that videos existed by asking defense counsel to provide blank CDs on which to transfer the footage. (*Id.* at 3-4).

85. Amazingly, the DA's Office never actually presented the video evidence to defense counsel and omitted any mention of videos on its disclosure form. (*D00136-37). Upon information and belief, the DA's Office currently claims that no video can be located. (*D00153-54).

86. In any event, the DA's Office soon realized that the facts alleged in the criminal complaint against Mr. May-Shaw following his August 2016 arrest fell short of meeting

applicable legal standards; there was no constitutionally compliant arrest or search of him. (D00781-83).

87.     In a February 2017 internal memo, ADA Bureau Chief Robert Walsh recommended dismissal of the case against Mr. May-Shaw. (*Id.*). Then, on March 16, 2017, prior to any pre-trial motion practice, ADA Cardinale moved, on behalf of prosecuting attorney ADA D'Agostino, to dismiss all charges arising from Mr. May-Shaw's August 2016 arrest. (3/16/17 Court Transcript at 2-3, *People v. Mayshaw*, Ind. No. 6850/16 (Sup. Ct. N.Y. Cty.)). When the Court asked why, ADA Cardinale responded: "Because we cannot prove guilt beyond a reasonable doubt." (*Id.*).

88.     Attorneys at that March 2017 hearing also discussed other details surrounding the dismissal with the Court off the record. (*Id.*). When the Court later asked Mr. May-Shaw's defense attorney to state for the record "why the case should be dismissed," he replied: "Judge, my conversation with the District Attorney's Office, there are certain search—stop and search issues, the People would not prevail at a hearing and, based upon that, they have agreed to dismiss the indictment." (*Id.* at 3-4). When directly questioned by the Court again, ADA Cardinale still declined to provide any further explanation on the record. (*Id.* at 4). The Court then "accept[ed] the assistant district attorney's statement that [the case was] carefully reviewed" and dismissed the case. (*Id.*).

## III.    THE REPEATED AND EGREGIOUS VIOLATIONS OF MR. MAY-SHAW'S DUE PROCESS PROPERTY RIGHTS

89.     The NYPD officers involved in Mr. May-Shaw's June 2016 and August 2016 arrests, through the use of established state procedures, violated clear constitutional mandates specifying that an arrestee must be given notice of the procedures to be followed to recover his

seized non-contraband property, either through a voucher explaining the procedures or some other method. *Butler v. Castro*, 896 F.2d 698, 702-04 (2d Cir. 1990).

90.     In connection with Mr. May-Shaw's arrests, the NYPD failed to provide him with any vouchers or information about how to recover his property, failed to return his seized property, and failed to take steps to initiate forfeiture proceedings. Instead, the NYPD inverted the parties' burdens regarding property release, ███████████████████████████████████ ████████████████████████████████████████████████████████████████████.

91.     To the extent that any post-deprivation remedies were available to him, they were evidently inadequate, as both Mr. May-Shaw and his Power of Attorney, Ms. Buggs, made numerous unsuccessful attempts to retrieve his property by contacting the 67th Precinct, NYPD IAB investigators, the NYPD Property Clerk's Office, the DA's Office, and the Kings County Supreme Court, as set forth in more detail below.

A.     <u>As a result of his June 2016 arrest, Mr. May-Shaw's property was wrongfully seized without probable cause, and his due process notice rights were violated.</u>

92.     Following his first arrest, the 67th Precinct conducted searches of Mr. May-Shaw's person. But Mr. May-Shaw was just a passenger in the Porsche that was pulled over for having a supposedly forged license plate and allegedly illegally tinted windows—not the driver or owner of the vehicle—so the NYPD had no probable cause to arrest or lawfully search him. ██████████

93.     Compounding their serious errors, the 67th Precinct also failed to provide Mr. May-Shaw with any vouchers for the non-contraband property they unlawfully seized from him or to otherwise notify him of procedures to reclaim his property—as required by the due process clause of the U.S. Constitution. *Butler v. Castro*, 896 F.2d 698, 702-04 (2d Cir. 1990).

94.     While at the 67th Precinct, officers removed Mr. May-Shaw's sunglasses, keys, and about $6,747 in cash from his person. But none of these items was ever invoiced, vouchered, or returned to Mr. May-Shaw, and he was never informed of any procedures for reclaiming them.

███████████████████████████████████

95.     The Complaint Room Screening Sheet stated that Officer Smith "recovered 6,747 dollars from [Mr. May-Shaw's] person." (D00015-16). And Mr. May-Shaw's Prisoner Pedigree Card from June 15, 2016—which was handwritten by Officer Smith—confirmed that "sunglasses, keys" and "$6,737" were taken off Mr. May-Shaw's person. (D00507).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

96.     ████████████████████████████████████████

███████████████████████████████████████████████

Yet, somehow, nearly all of it soon went missing.

97.     Specifically, as a result of the vehicle search that Officer Smith conducted alone, the following pieces of Mr. May-Shaw's property were seized and invoiced by Officer O'Hare but never vouchered or returned: numerous electronic devices; cell phone cases; a handbag; and an Adams receipt book. (D00101-02). Mr. May-Shaw's other seized documents were not even invoiced—and they too have apparently gone missing. Mr. May-Shaw was never informed of any procedure by which he could reclaim his property.

98.     As the officers who conducted the searches and seizures and/or handled the invoicing of Mr. May-Shaw's property, Officers Smith and O'Hare bear primary responsibility for the NYPD's failure to properly document, voucher, and secure Mr. May-Shaw's personal items. (Supp. Tr. at 38-39).

B.     <u>After his second arrest, Mr. May-Shaw's due process property rights were again violated, as additional property of his was seized and he was given insufficient notice of the procedures by which he could reclaim it, and good faith attempts to recover his property were rebuffed.</u>

99.     On August 10, 2016, Officer Kancler searched and confiscated property from: Mr. May-Shaw's person; the inside of Ms. Morris's rental car; and the room at the hotel where Mr. May-Shaw and Ms. Morris were staying. Officer Kancler subsequently invoiced, but did not voucher, all of Mr. May-Shaw's personal items, including, without limitation: currency; sunglasses; electronic devices; backpacks; sneakers; clothing; a watch; belts and other accessories; suitcases; and miscellaneous papers. (*D00077-78, *D00053-56, *D00063-66, *D00048). Mr. May-Shaw was never notified of procedures by which he could reclaim this property.

100.     None of the property seized from Mr. May-Shaw in August 2016 was ever returned to him, despite repeated attempts he and Ms. Buggs made between March and October 2017 to recover it after his underlying criminal case was dismissed. The NYPD and the City, through its many officials, chose instead to unlawfully withhold his property.

101.     Beginning on March 20, 2017, four days after the criminal case stemming from Mr. May-Shaw's August 2016 arrest was dismissed, Ms. Buggs repeatedly contacted the DA's Office, various NYPD officers, and even the Justice presiding over one of Mr. May-Shaw's criminal cases to try to reclaim his property. Unfortunately, each of her attempts was unsuccessful, as none of the City's employees notified her or Mr. May-Shaw of the proper steps

that needed to be taken in order to retrieve his seized personal items. And because Mr. May-Shaw was never provided with any voucher explaining these processes either, he had no basis for knowing what to do.

102.    Ms. Buggs spent days shuttling between the NYPD Property Clerk's Office at 11 Front Street and the DA's Property Release Unit at 120 Schermerhorn Street to retrieve the proper paperwork to try to obtain Mr. May-Shaw's property.

103.    Mr. May-Shaw's and Ms. Bugg's many attempts to reclaim Mr. May-Shaw's property, and their inability to ultimately succeed, is well-documented and reflected in emails, faxes, letters, and notes of phone calls to numerous City employees, including, without limitation: ADA Chong; ADA Walsh; Justice Simpson's chambers; Property Clerk Cassandra Allen of the Brooklyn Property Clerk Office at 11 Front Street; Joseph Smith of the DA's Property Release Unit at 120 Schermerhorn Street; Sergeant Janine Spencer; Officer Richard Gonzalez; Sergeant Thomas Reeder; New York Courts employee Ana Almenar; and Robert F. Messner, NYPD Assistant Deputy Commissioner for the Legal Bureau's Civil Enforcement Unit.

104.    Mr. May-Shaw and Ms. Buggs thus tried repeatedly to reclaim his property from the very agencies that were violating and/or enabling violations of his due process rights. However, after attempting in vain for over six months, Mr. May-Shaw ultimately has had to turn to this Court to obtain relief, as the established government practices and procedures for recovering his property in New York are constitutionally inadequate. *See, e.g., Larkin v. Savage*, 318 F.3d 138, 141 (2d Cir. 2003) (claimant followed all instructions given to him by government to retrieve property, yet could not recover it, raising serious questions as to whether state procedures for recovering property were constitutionally adequate).

C.     Prior to Mr. May-Shaw's arrests, the City had notice of the NYPD's pattern and practice of providing constitutionally deficient procedures for vouchering, safeguarding, and returning property.

105.     The NYPD has long engaged in due process violations regarding the management of property taken from people they arrest. Such violations include: failing to voucher property taken; failing to sufficiently inform arrestees of how to recover their property; failing to safeguard the property; and failing to provide a reasonable manner for recovering the property.

106.     The City has "permitted the[se] practice[s] to continue unremedied for so long that it amounts to an illegal policy or practice" within the NYPD of seizing and holding property without due process. *Remigio v. Kelly*, No. 04 CV 1877, 2005 WL 1950138, at *11 (S.D.N.Y. Aug. 12, 2005) (citing *Krimstock v. Kelly*, 306 F.3d 40, 44-46 (2d Cir. 2002), *cert. denied*, 539 U.S. 969 (2003)).

107.     The following cases, among others, establish that the City was on notice of the NYPD's pattern of non-compliance with due process requirements prior to Mr. May-Shaw's arrests, and that the City knows or should know that additional due process protections are needed for individuals whose property gets seized by the NYPD:

▪      In December 2006, the NYPD seized Wesley Sommerville's car based on an unspecified suspicion that it was stolen. Mr. Sommerville later attempted to recover his car but, while doing so, was arrested for having previously possessed the allegedly stolen car. His resulting criminal case was subsequently dismissed and a release for the car was issued, but Mr. Sommerville was still unable to reclaim it. He eventually filed a civil suit detailing that the NYPD informed him that they had given the vehicle back to its "owner." In February 2014, the City resolved this dispute with Mr. Sommerville through a confidential settlement. *Sommerville v. Wright, et al.*, No. 12 CV 0165 (E.D.N.Y.).

▪      In November 2014, while Enrico Carini was driving a car owned by his aunt, Angela Carini, he was arrested by the NYPD for possession of a controlled substance— prescription medication. According to his related civil rights complaint, Mr. Carini had a prescription for the pills in question, and his criminal case was adjourned in contemplation of dismissal. From Mr. Carini's arrest, the NYPD seized and vouchered his aunt's car and $557 of Mr. Carini's money. But none of the other cash Mr. Carini said was seized during his arrest was ever vouchered, and neither the car nor the vouchered sum of money was ever returned. So, Mr. Carini and his aunt sued the City and certain

NYPD officers for, *inter alia*, unlawful seizure and due process violations related to the deprivation of their property. Upon information and belief, in April 2016, the City reached an $11,000 cash settlement with the Carinis. *Carini, et al. v. The City of New York, et al.*, No. 15 CV 5660 (E.D.N.Y.).

▪  In January 2015, Edward Parks was arrested for allegedly selling crack cocaine. According to his related civil rights complaint, officers strip-searched him and seized the money he had on hand but failed to invoice or voucher it—instead providing Mr. Parks with a prisoner property receipt merely stating "$35." Those police officers failed to appear or testify during five separate court appearances, and the case against Mr. Parks was ultimately dismissed by motion of the prosecutor. Mr. Parks subsequently sued the officers involved in his arrest and prosecution for, *inter alia*, due process violations and unlawful seizure. Upon information and belief, the City ultimately settled that case for $7,500. *Parks v. Colon, et al.*, No. 15 CV 7310 (E.D.N.Y.).

▪  In January 2016, the Bronx Defenders filed a class action lawsuit on behalf of Victor Encarnacion, Kaleb Hagos, Kenneth Clavasquin, and a class of similarly situated plaintiffs against the City alleging widespread constitutional failures by the NYPD to voucher or return property to arrestees following the dismissals of their criminal cases. The three plaintiffs in that case had all been arrested by the NYPD and then unlawfully prevented by the City from retrieving their seized non-contraband property after their criminal cases had terminated, and at least one of the plaintiffs had received no vouchers for his property, despite the fact that the NYPD is required to provide them. In February 2018, the NYPD and the Bronx County District Attorney's Office stipulated to a settlement and order instituting several reforms aimed at increased scrutiny and supervision of the NYPD to ensure the appropriate return of arrestees' property. *Encarnacion, et al. v. City of New York*, No. 16 CV 0156 (S.D.N.Y.).

108.    With respect to Mr. May-Shaw's wrongful arrests and seizures by the NYPD in particular, the City also was or should have been on notice of violations of his due process property rights because the NYPD's Internal Affairs Bureau ("IAB") and Civilian Complaint Review Board ("CCRB") have received numerous complaints over the years about the individual Defendants here improperly vouchering property and/or failing to secure or ensure the return of property to arrested citizens.

109.    ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

110.   ███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████

111.   ███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████

112.   These repeated complaints about the NYPD generally and about individual officers specifically named in this action by Mr. May-Shaw put the City on notice that further intervention was necessary and should have been taken to prevent civilians like Mr. May-Shaw from being deprived of their due process rights to receive sufficient notice of procedures for reclaiming seized property. But despite notice of the NYPD's persistent violations of citizens' property rights, the City has continually failed to take action to prevent such violations in the future.

113.   The City's failure to adequately address this kind of unlawful police conduct resulted in serious harm to Mr. May-Shaw, beginning in the summer of 2016 and continuing through the present day. In addition to the pecuniary harm he suffered, Mr. May-Shaw has endured personal and emotional injuries, including, without limitation, mental anguish and distress, fear, psychological pain, embarrassment, and humiliation.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
**False Arrest and Imprisonment in Violation of**
**Fourth and Fourteenth Amendment Rights Against**
**Unreasonable Searches and Seizures**
**(against Defendants Smith, Pierre, Kancler, Blum, Zayas,**
**Villacis, Laverty and Denora in their individual capacities)**

114.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

115.    Under the Fourth and Fourteenth Amendments of the U.S. Constitution and 42 U.S.C. § 1983, Plaintiff has the right to be free from unreasonable and illegal searches and seizures, including, without limitation, false arrest and imprisonment.

116.    Defendant Smith violated Plaintiff's rights in June 2016, when she intentionally arrested Plaintiff without justification, privilege or probable cause.

117.    Defendant Smith took these unlawful actions while under the command and supervision of Defendant Pierre, who was present during Plaintiff's June 2016 arrest and relevant events leading up to it, and thus directly participated in the wrongdoing.

118.    Defendant Kancler violated Plaintiff's rights in August 2016, when he intentionally arrested Plaintiff without justification, privilege or probable cause.

119.    Defendants Blum, Villacis, Laverty, and Denora violated Plaintiff's rights in August 2016, when, upon information and belief, they assisted with and/or failed to intervene while observing Defendant Kancler's unlawful arrest of Plaintiff. Upon information and belief, these Defendants reasonably could have intervened to prevent this unlawful arrest, but they chose not to do so.

120.    Defendants Kancler, Blum, Villacis, Laverty, and Denora took these actions and/or failed to act while under the command supervision of Defendant Zayas, who, upon

information and belief, was present during Plaintiff's August 2016 arrest and relevant events leading up to it, and thus directly participated in the wrongdoing.

121.   All of these Defendants violated Plaintiff's constitutional rights again by detaining and imprisoning him without probable cause to believe that he had committed any crime.

122.   All of these Defendants were acting under color of state law during the events giving rise to this action.

123.   The supervisory Defendants were, at all relevant times, supervisory personnel within the NYPD, with oversight responsibility over the individual Defendants. They were responsible for the training, instruction, supervision and discipline of the individual Defendants, who unlawfully arrested, detained, and imprisoned Plaintiff without probable cause.

124.   The supervisory Defendants failed to protect Plaintiff despite their actual or constructive knowledge that the individual Defendants were engaged in conduct that posed a pervasive and unreasonable threat to Plaintiff's constitutional rights. Their failure to supervise and discipline the individual Defendants amounts to gross negligence, deliberate indifference, tacit approval, and/or intentional misconduct.

125.   As a direct and proximate result of the acts and omissions of the Defendants named in this claim for relief, Plaintiff has been deprived of his rights under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983 and suffered damages in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF:**
**Unlawful Deprivation of Property in Violation of**
**Fourteenth Amendment Guarantees of**
**Procedural Due Process**
**(against Defendants Smith, O'Hare, and Kancler,**
**individually and in their official capacities)**

126.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

127.    Under the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983, Plaintiff has the right not to be deprived of his property without due process of law.

128.    Defendants Smith and O'Hare violated Plaintiff's rights in June 2016 when they seized and invoiced or failed to invoice and otherwise disposed of Plaintiff's property and/or assisted in the seizure, invoicing, or disposal of Plaintiff's property without providing Plaintiff with any voucher containing constitutionally required notice provisions. They also failed to inform Plaintiff of any procedures that he could follow to reclaim his property. Plaintiff was deprived of his property as a result. Upon information and belief, Defendants Smith and O'Hare knew or should have known that no other City employee had informed or would be informing Plaintiff of the required reclamation procedures.

129.    Because Plaintiff was never given proper notice of any New York state law post-deprivation remedy available to him, the conduct of Defendants Smith and O'Hare caused further injury to Plaintiff; beginning in June 2016, the NYPD and the City continued to retain his property while depriving him of a hearing where he could challenge its continued retention.

130.    Defendant Kancler separately violated Plaintiff's rights in August 2016, when he seized and invoiced property from Plaintiff's person, a rental car, and a hotel room without providing any voucher to Plaintiff with the constitutionally required notice printed on it. Defendant Kancler also failed to otherwise notify Plaintiff of the procedures that could be

followed to reclaim his property, and Plaintiff was deprived of his property as a result. Upon information and belief, Defendant Kancler knew or should have known that no other City employee had informed or would be informing Plaintiff of the required reclamation procedures.

131.    Because Plaintiff was never given proper notice of any New York state law post-deprivation remedy available to him, Defendant Kancler's conduct caused further injury to Plaintiff; beginning in August 2016, the NYPD and the City continued to retain his property while depriving him of a hearing where he could challenge its continued retention.

132.    All of these Defendants were acting under color of state law during the events giving rise to this action and with intent to deprive Plaintiff of his property.

133.    Plaintiff never received constructive notice of available state law procedures for reclaiming his property, and his incarceration following his wrongful arrests also prevented him from discovering any means by which he could reclaim his property.

134.    As a direct and proximate result of the acts and omissions of the Defendants named in this claim for relief, Plaintiff has been deprived of his rights under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and suffered damages in an amount to be proven at trial.

135.    The NYPD's widespread practice of depriving individuals of their seized property without providing constitutionally adequate notice or opportunity to challenge its seizure demonstrates that the unconstitutional acts of the Defendants named in this claim were undertaken in accordance with an established state procedure of disregard for individuals' due process rights. And the City's failure to this day to update its Administrative Code to properly outline property retrieval procedures is causing continued harm to Plaintiff and, upon information and belief, countless other citizens.

**THIRD CLAIM FOR RELIEF:**
**Malicious Prosecution in Violation of**
**Fourth and Fourteenth Amendment Rights**
**(against Defendant Smith, individually)**

136.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

137.    Under the Fourth and Fourteenth Amendments of the U.S. Constitution and 42 U.S.C. § 1983, Plaintiff has the right to be free from unreasonable seizures, and the right to due process of law, including protection from malicious prosecution.

138.    Defendant Smith commenced and encouraged unjustified criminal proceedings against Plaintiff by completing and signing a criminal complaint in June 2016, and subsequently providing false testimony regarding his supposed possession of a handgun, drugs, and an allegedly forged license plate in support of the prosecution's case against him.

139.    For example, Defendant Smith violated Plaintiff's rights when she provided conflicting and unreliable testimony in connection with Plaintiffs' prosecution about where the handgun was allegedly found in the Porsche and as to whether Plaintiff had ever produced any documentation for that vehicle—two issues central to the criminal case and likely to influence a jury.

140.    Defendant Smith also violated Plaintiff's rights by falsely testifying that he had claimed ownership of the Porsche with the allegedly forged license plate, which statement, if it had been true, would have established probable cause for his arrest and, if not properly suppressed (as it was), influenced a jury's deliberations regarding his criminal liability.

141.    As the presiding Justice held in suppressing all evidence against Plaintiff in that case, no probable cause ever existed to arrest Plaintiff or search and seize his property, let alone to charge and commence legal proceedings against him. And Defendant Smith knew or should

have known as much. Notably, when the extent of Defendant Smith's incredible statements about the arrest and seizures came into view, the case against Plaintiff was promptly dismissed.

142.   Defendant Smith arrested and assisted in the prosecution of Plaintiff with malice, as evidenced by the lack of probable cause and her willingness to provide incredible testimony regarding the most important facts of the case. Her lack of credibility under oath also underscores the seriousness of her improper motives.

143.   Due to Defendant Smith's misconduct, Plaintiff faced substantial post-arraignment restraints and harms, including, without limitation: incarceration for approximately 12.6 months; and being forced to appear in court approximately 25 times over a period exceeding 13 months to answer the criminal charges brought against him based on his wrongful June 2016 arrest.

144.   Defendant Smith was acting under color of state law during the relevant events giving rise to this action.

145.   As a direct and proximate result of the acts and omissions of Defendant Smith, Plaintiff has been deprived of his rights under the Fourth and Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and suffered damages in an amount to be proven at trial.

**FOURTH CLAIM FOR RELIEF:**
**Deprivation of Rights in Violation of 42 U.S.C. § 1983**
**(against Defendant City of New York)**

146.   Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

147.   Defendant City's official policies, practice, and customs of mishandling seized property and providing inadequate due process for the return of that property have deprived Plaintiff of his constitutional rights.

148.     Defendant City has a long and well-documented history of providing insufficient notice of procedures to reclaim seized property, including, without limitation, failing to provide arrestees with vouchers required for such property or to amend the Administrative Code properly to outline property return procedures, resulting in continued loss of property by owners without due process, even after a determination that the property should be released from NYPD custody.

149.     Defendant City is thus responsible for the injuries that it caused and/or assisted in causing Plaintiff, and is specifically liable to Plaintiff for violations of his rights as guaranteed by the Fourteenth Amendment to the United States Constitution.

150.     Upon information and belief, Defendant City acted with deliberate indifference towards Plaintiff's constitutional rights.

151.     As a direct and proximate result of the City's policies, practices, and customs, and related inaction and indifference, Plaintiff has suffered damages in an amount to be proven at trial.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Christopher May-Shaw respectfully requests that the Court grant the following relief against Defendants, jointly and severally:

(a)     Monetary damages in an amount to be determined at trial to compensate Plaintiff for the injuries he sustained as a result of the events and conduct alleged herein;

(b)     An award of punitive damages against individual Defendants sued in their individual capacities in an amount to be determined at trial;

(c)     Statutory interest on any and all damages awarded to Plaintiff;

(d)     Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

(e)     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues in this case so triable.

Dated:  New York, New York
        August 28, 2020

Respectfully submitted,

KRAMER LEVIN NAFTALIS &
FRANKEL LLP

By:   /s/ Michael Martinez
     Michael Martinez
     Seth F. Schinfeld
     Elise C. Funke
     1177 Avenue of the Americas
     New York, New York 10036
     (212) 715-9100

*Attorneys for Plaintiff*